ROBERT H. HARPER *et al., Appellants,* V. JAMES M. HARPER *et al., Appellees.*

No. 16,829.

SYLLABUS BY THE COURT.

1. PRACTICE, DISTRICT COURT—*Findings of Fact—Conclusions of Law.* Where a court is requested at the commencement of a trial to prepare findings of fact and conclusions of law it is the duty of the court to comply with the request, and if such findings state in separate paragraphs the facts presented, clearly, concisely, and in a manner that they may be readily understood, and so it will be apparent what conclusions the court reached and the facts upon which such conclusions are founded, this will be deemed a sufficient compliance with the request, even though some of the paragraphs may contain a compound of both fact and law and do not in every instance separate with technical accuracy the findings of fact from the conclusions of law.

2. EVIDENCE—*Testimony by a Party—Action against Administrator.* It is not error, under section 320 of the code of 1909, to permit a party to testify in an action against an administrator or executor, where the testimony contains no communication or transaction with the deceased.

3. ——— *Offer of Proof—When Necessary.* Where a witness is excluded from giving testimony, and none is given and no offer of proof is made and the question does not clearly indicate the nature of the evidence which the witness is expected to give, such exclusion will not be deemed erroneous.

4. ——— *Husband and Wife.* In an action to set aside a will the principal legatee died pending the action, and a revivor was had in the name of his widow, who was the executor of her deceased husband and his sole heir at law. She was called as a witness in the action to set aside the will. Specific objection was made that the witness was incompetent because she was the widow of one of the original parties to the suit. *Held,* that she was not incompetent, as she did not testify to any communication between herself and husband during their marriage.

Appeal from Sumner district court. Opinion filed January 7, 1911. Affirmed.

*McGinley & Wiley, C. V. Ferguson, Kos Harris,* and
*Ed T. Hackney,* for the appellants.

*J. T. Herrick,* and *W. W. Schwinn,* for the appellees.

The opinion of the court was delivered by

GRAVES, J.: This is an action to set aside a will be-
cause the testator did not possess testamentary ca-
pacity when the will was made and because of the
undue influence of the principal legatee in causing the
will to be made. The action was brought by several of
the smaller legatees. The will was sustained by the dis-
trict court, and the plaintiffs appeal.

The principal error of which the appellants com-
plain is the failure of the court to file findings of fact
and conclusions of law separately, as requested. It is
claimed that the paper filed purporting to be in com-
pliance with this request required a different judgment
to be rendered from the one that was entered. The
court evidently thought it was fully complying with
this request, and to show what was done in this respect
the court's work is given in full. As a part of the judg-
ment the court found:

"And now, on this 2d day of August, A. D. 1909, the
court having been heretofore requested to make find-
ings of fact and conclusions of law in the above-entitled
action, the court finds:

"(1) John M. Harper died on the first day of April,
1907, leaving him surviving as his heirs at law, who
were all of the heirs and the only heirs at law surviving
him, to wit, Robert H. Harper and others, plaintiffs,
and James M. Harper and others, defendants.

"(2) That since the bringing of this action James M.
Harper departed this life, on August 14, 1908, leaving
him surviving as his only heir at law Min. S. Harper,
and this cause has been duly and regularly revived as
to said Min. S. Harper, who appeared in this action
and adopted the answer theretofore filed by the said
James M. Harper, deceased.

"(3) That John M. Harper duly executed his will on

tne 17th day of July, 1906, being the will herein in controversy.

"(4) That prior to the first day of June, 1903, and for many years prior thereto, John M. Harper, late of Sumner county, Kansas, deceased, resided at or near Assumption, in the state of Illinois, and during that time was possessed of real estate and personal property as hereinbefore set out, to wit: [Here follows a description of the real property.]

"He also owned certain notes and mortgages of the value of $13,500.

"He also was possessed of a large sum of money which was deposited in the bank of Assumption, Ill., and at said time was also possessed of personal property consisting of notes, mortgages and money.

"(5) That the said John M. Harper and his wife during their lifetime never had any children.

"(6) The wife of John M. Harper died in September, 1902, and after her decease he lived with Joseph Kemmerer, Joseph Harper, Alonzo Harper, and William Kemmerer, until he came to Conway Springs, Kan.

"(7) In the month of February, 1903, the said John M. Harper was taken ill and was ill at the house of Joseph Kemmerer (whom he had raised and who had for years lived on his farm) for the space of about two weeks, and after he became convalescent he was taken to the home of Joseph Harper, who lived on one of the tracts of land belonging to the said John M. Harper.

"(8) During the time of his illness at the home of Joseph Kemmerer, James M. Harper, deceased, went from Conway Springs, in Sumner county, Kansas, to Assumption, Ill., and went to the home of Joseph Kemmerer, and at said time said James M. Harper was desirous that said John M. Harper should accompany him, the said James M. Harper, to Conway Springs, Kan., and make his home with the said James M. Harper.

"(9) That the said James M. Harper was a banker in Conway Springs, and had been in such business at Conway Springs since 1885. That during the time that James M. Harper lived in Conway Springs, John M. Harper visited James M. Harper, together with Robert Harper, once prior to 1903. That during the time that the said John M. Harper lived in Assumption, Ill., the said James M. Harper visited the said John M.

Harper—prior to the death of the wife of the said John M. Harper—three times, which said visits were limited to two or three days with the said John M. Harper and other relatives. After the death of the wife of John M. Harper, the said James M. Harper wrote four letters to the said John M. Harper to come and live with the said James M. Harper at Conway Springs, Kan., and in said letters held out the inducement to said John M. Harper that he could avoid the payment of taxes on personal property for the year 1903, if he, the said John M. Harper, left Illinois and went to Conway Springs prior to April, 1903, and that he could get a greater rate of interest on moneys in Kansas and live without expense.

"(10) That said John M. Harper at the time of his decease, April 1, 1907, was of the age of 82 years. That in his younger years the said John M. Harper was a stout, vigorous, hard-working, prudent and economical man. That in his after years and at the time of the death of his wife he had become, of his age and experience, impaired in mind and body about as is usual of such persons, and remained so until his death.

"(11) That in his after years, and particularly after the death of his wife, John M. Harper was very close and saving in all matters of expense of living, and very close in his business matters.

"(12) That in his after years John M. Harper was very deaf and quite difficult to communicate to or with.

"(13) About the time of John M. Harper's removal from Assumption to Conway Springs, Kan., he discussed the question of taxes and of the high rates of taxes generally, and he was solicitous as to how to reduce the payment of taxes, or to avoid the taxes altogether.

"(14) In June, 1903, James M. Harper went to Assumption, Ill., and brought the said John M. Harper from Assumption, Ill., to Conway Springs, and from that time until the date of his death the said John M. Harper made his home at the house of the said James M. Harper, except when he made visits back to his Illinois relatives and to collect rents in the summer of each year, and on his visits to Illinois from Conway Springs he was always accompanied by James M. Harper, or the wife of James M. Harper, both to and from Conway Springs to Assumption, and on the only

other visit, which was to Sidney, Neb., he was accompanied by the wife of James M. Harper. That during the time John M. Harper lived at James M. Harper's he did not pay any board or pay for the use of the room he occupied.

"(15) That in the year 1902, after the death of the wife of the said John M. Harper, the said John M. Harper caused to be erected over the grave of his wife a monument, of the value of $200, and on said monument was inscribed the name of the wife of the said John M. Harper, together with the date of her death, and suitable space was left on said monument to inscribe the name, birth and death of the said John M. Harper.

"(16) That a few days prior to July 17, 1906, James M. Harper caused to be prepared in typewriting by his stenographer, then in his employ in his bank at Conway Springs, a memorandum disposing of the property of the said John M. Harper, and at said time said James M. Harper had prepared deeds from the said John M. Harper to various parties, describing the lands as set forth in the memorandum. That said memorandum and deeds were prepared by the said stenographer under the dictation and direction of the said James M. Harper, without the said John M. Harper being present at the preparation of the said instruments, and when prepared were taken possession of by said James M. Harper; that said deeds offered in evidence in this action and described in the will were the deeds prepared by the said stenographer under the direction of the said James M. Harper.

"(17) That subsequent to the preparing of the said memorandum and deeds and prior to July 17, 1906, James M. Harper asked H. C. Sluss, an attorney in Wichita, Kan., by telephone, if he would be in his office on a day mentioned and if he could prepare a will for a friend of the said James M. Harper, the name of the party to make not being disclosed to said attorney. That afterward, on the request of said James M. Harper by telephone, said attorney went from Wichita, Kan., to Conway Springs, Kan., on said July 17, 1906, and upon his arrival at Conway Springs went to the bank of James M. Harper, and was from there taken by James M. Harper to his home and there introduced to said John M. Harper as his uncle, the party who was ex-

pected to make a will, and said attorney at said time for the first time learned that the party to make the will was the uncle of the said James M. Harper; that said attorney at said time received a typewritten memorandum which he used in preparing the will; that the said lawyer and John M. Harper remained at the house but a short time, when they went to the bank of James M. Harper, and said attorney and his stenographer and James M. Harper and John M. Harper were present at the time of the dictation and preparation of the will thereafter executed by John M. Harper on said date, and all of said time there was an opening between the room in the bank where the parties were dictating and preparing said will and the front part of the bank; that during the dictation of the will and the preparation of the same James M. Harper was in and out of both rooms. After said will was dictated and prepared, the said James M. Harper procured the witnesses to said will. That after the will was prepared and ready for signature the attorney read the same over to said John M. Harper, but same was not read over to the witnesses. After the will was executed, the same was delivered to James M. Harper, who paid said attorney for his services, and said James M. Harper placed said will, together with other papers, in a tin box that belonged to said John M. Harper, in the bank vault. That said John M. Harper executed the deeds mentioned and described in the will, and said deeds were witnessed by the attorney who drew the will, being the same deeds theretofore prepared by the stenographer under the dictation of James M. Harper, and said deeds were taken possession of by said James M. Harper and placed in the tin box of said John M. Harper in said bank.

"(18) The court finds that at the time of the preparation of said will the amount or value of the property mentioned in the residuary clause was not discussed between said John M. Harper and said attorney, at or before the preparation and execution of said will.

"(19) The court finds that after John M. Harper came to Conway Springs, Kan., the said James M. Harper purchased for John M. Harper $15,000 of United States government bonds, which said bonds were kept in the Corn Exchange Bank in Chicago, Ill.

"(20) The court finds that, prior to the removal of John M. Harper from Illinois to Conway Springs, Kan., through James M. Harper and John W. Harper he had invested a large amount of money and loaned a great deal of money on real estate in Kansas and Nebraska. After the said John M. Harper came to Conway Springs, Kan., the said James M. Harper had charge, looked after all of his loan business in Kansas, collected his interests on loans, and bought loans for him. That it was the custom of said James M. Harper, who had sole charge of the bank at Conway Springs, whenever the said John M. Harper had funds in the bank, to take a loan to that amount out of the bank, make it over to the said John M. Harper, and to charge up the account of said John M. Harper with the amount of said loan, and when interest was collected on said loan to credit the account of the said John M. Harper with the interest on said loan at the rate of 6 per cent, and to pass to the account of James M. Harper the balance of the interest paid on said loan, and the loans which were transferred from the bank to the said John M. Harper brought interest ranging from 7 per cent to 9 per cent, and none of said loans was ever assigned of record to the said John M. Harper, but stood of record in the name of the Bank of Conway Springs.

"(21) The court finds that said James M. Harper told parties residing in Conway Springs that the said John M. Harper was an old uncle of his who had raised him, and by reason of the old man having taken care of him when he was young, he was now taking care of the old man; that he had no property except a little piece of swamp land in Illinois.

"(22) The court finds that said John M. Harper died on the first day of April, 1907, at the office of Doctors Ferris and Evans, in Conway Springs, Kan. That James M. Harper, when told of the death of his uncle, immediately came to where his uncle lay dead upon the floor, and the first act of the said James M. Harper was to take from the pockets of John M. Harper some papers.

"(23) The court finds that after the death of the said John M. Harper the said James M. Harper took the body of the said John M. Harper to Assumption, Ill., for burial, and while there told Joseph Harper that he did not know whether or not the said John M. Harper had made a will, but advised the said Joseph Harper

to be very careful in paying his rent on the land that said Joseph Harper lived on for fear he might not pay it to the right party.

"(24) The court finds that in the summer of 1907, on or about the 15th day of July, the said James M. Harper went from Conway Springs to Assumption, Ill., and there at that time stated that he was surprised to find his uncle had made a will; that he had supposed if his uncle had made a will that it was in the bank at Assumption, Ill., but to his surprise he found when he got home from the funeral that there was a will made in Kansas by an attorney that his uncle had procured to make the will, without the knowledge of the said James M. Harper.

"(25) The court finds that during the time the said John M. Harper lived in Conway Springs, at the home of James M. Harper, that he walked around in the town and on two or three occasions he became lost and could not find his way to the home of James M. Harper and he was conducted home by other parties a distance of two or three blocks; and the court finds that the city of Conway Springs is a city of the third class, in Sumner county, Kansas.

"(26) The court finds that on April 18, 1907, after the death of John M. Harper, James M. Harper probated the will and qualified as executor of the last will and testament of the said John M. Harper; that he never filed any inventory of the estate coming into his hands or of the estate of the said John M. Harper, and that James M. Harper died on or about the 14th day of August, A. D. 1908.

"(27) That the deeds mentioned in the will and made by the said John M. Harper were from the time of their execution in July, 1906, in the bank at Conway Springs, and in the possession of James M. Harper after the death of John M. Harper, until the month of July, 1907, when said James M. Harper visited Illinois and placed them of record in the respective counties, and, after they were placed of record, delivered to the respective grantees therein named and as named in said will.

"(28) The court finds that James M. Harper was appointed executor of the estate of John M. Harper on or about the 18th day of April, 1907, and duly qualified after that.

"(29) The court finds that John M. Harper during his lifetime was never assessed with any personal property for taxation in Sumner county, Kansas; James M. Harper, as executor of said estate, never assessed any personal property for taxation belonging to the estate of John M. Harper, nor did James M. Harper ever assess any personal property as agent of John M. Harper for taxation from 1903 to and including the year of 1908.

"(30) The court finds that Min. S. Harper was duly appointed as administratrix of the estate of James M. Harper on or about the — day of August, A. D. 1908.

"(31) That Joseph Kemmerer, a nephew of the wife of John M. Harper, lived with the said John M. Harper for eighteen years, and up until the time the said Joseph Kemmerer was married in 1893. Subsequent to his marriage said Joseph Kemmerer remained away from John M. Harper about a year, and then returned and lived upon one of the tracts of land heretofore described, from 1893 down to the present date, and that said Joseph Kemmerer made valuable improvements on said land, some of which were made after the said John M. Harper visited in Illinois about the 17th day of July, 1906, at which time said Kemmerer requested the said John M. Harper to make certain improvements on the lands, and at which time said John M. Harper informed said Kemmerer that he had provided in his will for him to have this land and that all the improvements he desired must from thenceforth be made by the said Kemmerer.

"(32) The court finds that James M. Harper was a banker in Conway Springs for more than twenty years; he was a sharp, shrewd, vigorous, money-making, thrifty, successful business man, and of an exceedingly forceful character.

"(33) The court further finds that the property devised by the will of John M. Harper, by the residuary clause therein, gave to James M. Harper personal property alone of the value of $38,000.

"(34) The court further finds that when James M. Harper and John M. [W.?] Harper, legatees named in the will of John M. Harper, were small boys, John W. Harper being only an infant, their mother died, and that they were taken to the home of their uncle, Robert Harper, who was married and with whom John M.

49—83 KAN.

Harper lived, and kept there for a time. That afterward John M. Harper married and took his nephew, James M. Harper, to his house and raised him. That when James M. Harper was a small boy his father died, and John M. Harper was appointed guardian for James M. Harper and had control of a small estate left him by his father. James M. Harper lived with his uncle, John M. Harper, until he had finished his education in the district school and then went to Normal, Ill., and attended school and made his home with his uncle, John M. Harper, during vacation until he graduated from the state normal school and became a schoolteacher. That his home, with the exception of a short time when he was with his father, was always with his uncle, John M. Harper, until he became a man. That John W. Harper also lived with his uncle, John M. Harper, a part of the time. That during the civil war some refugees from Alabama were brought to Alton, Ill., and advertisements were made that there were children there who could be adopted by people desiring to adopt children, and John M. Harper went to Alton and got a little girl seven years old and brought her to his home near Assumption, Ill., and she made her home and lived with him and his wife and they raised her until she became a young lady, and while she was still living with them John W. Harper, brother of James M. Harper, and one of the legatees in the will of John M. Harper, married her and was at the time John M. Harper made his will living with said woman as his wife.

"The court further finds that during all of the time that John M. Harper lived with James at Conway Springs he was treated with great kindness and affection, and every care possible was taken of him by the wife of James M. Harper and all his wants were looked after, and that he was given by James M. Harper and his wife a very comfortable home for the last four years of his life.

" (35) The court further finds that all of the nephews and nieces who had ever lived in the neighborhood of Assumption, Ill., where John M. Harper lived, were remembered in his will and left a legacy.

" (36) The court further finds that John M. Harper and his wife, Sarah Harper, after the marriage of John W. Harper and the girl whom John W. [M.?] Harper

and his wife got from among the refugees from the civil war, and after James M. Harper had became a school-teacher, took four children named Kemmerer to raise, consisting of three boys and one girl. These children were the nephews and niece of Sarah Harper (but no blood relation to John M. Harper) ; that the girl married Alonzo Harper, one of the legatees in the will of John M. Harper; that William Kemmerer is one of those children and one of the legatees named in the will; that Joseph Kemmerer is one of those children and one of the legatees named in the will; that Charles Kemmerer was the older one of those children, and is now a man past middle age and lives at Lewiston, Ill., and is the owner of a half section of land and is a man in good financial circumstances.

"That Robert Harper, brother of John M. Harper, had a daughter who married a man named James Cochran, and had a daughter, Edna Cochran, and died. That James Cochran is a man of large means, and has no other children except his daughter Edna. That said Edna Cochran is a grandniece of John M. Harper and is the only blood relative who was raised about Assumption, Ill., who was living at the time of the making of said will, that received no legacy.

" (37) The court further finds that at the time the will in question was executed by John M. Harper said John M. Harper was of sound mind and understood fully the terms and conditions thereof; that said will was prepared by H. C. Sluss, of Wichita, Kan., who took pains not to incorporate therein any provisions except such provisions as were directed by and thoroughly understood by said testator, and that no undue influence was used or exerted by James M. Harper, or any other person, to procure the execution of said will, or to determine what provisions the same should contain; that James M. Harper took no part in the writing or preparation of said will except as hereinbefore stated; that said testator at the time he executed said will knew the conditions thereof and had advised with said H. C. Sluss with reference thereto.

"The court further finds for the defendants and against the plaintiffs as to each and all of the issues. joined in this action.

"The court further concludes, as to the execution of said will, that said will is valid and should be allowed

to stand and be executed as the will of said John M. Harper, deceased, and that the defendants are entitled to a judgment for costs herein."

It is unnecessary for a court in making findings of fact and conclusions of law to state each finding with technical accuracy and without combining the facts and the law together in any case. If the findings and conclusions are clearly stated, so that the conclusions reached by the court can be readily understood, as well as the facts upon which they are founded, this will be sufficient. We think the findings and conclusions in this case are sufficient, and are unable to say that they are erroneous in any particular.

It is urged that the facts found show that the will was procured by undue means, and that to this extent the judgment is inconsistent with the findings of fact. Some of the facts found are probably consistent with this conclusion, but the court found otherwise, and we think the facts found by the court amply justify its conclusion.

Specific complaint is made of the exclusion of evidence which the plaintiffs expected to present by witness Joseph Kemmerer, who was a party defendant and a legatee under the will. It is claimed that they expected the witness to testify that John M. Harper told him that the land then occupied by the witness would be finally given to him by will, but instead the will devised certain lots to him. We are unable to see that this has any importance to the matter in controversy. It seems to be immaterial, and, whether the witness was incompetent or not, no error was committed by the exclusion of the evidence. This witness was asked: "How did he appear to transact any business in his later years as to calculating his interest and finding out what was due him?" He answered: "For the last ten years he never relied on his own ability; he would generally get someone. If anybody paid him any money, he would either get me or the cashier at the bank to do

the figuring. You see, I have known him to come over at my place after I had gone to bed and get me up and have me count up." This was excluded on the ground that the witness was incompetent, but, whether he was competent or not, the evidence was immaterial and no error was committed by striking it out.

Complaint is also made of the exclusion of a conversation had by this witness with John M. Harper concerning the monument placed by the latter at the grave of his wife, who died some years before. Upon this monument a blank space was left, suitable for the insertion of his own name, which would link their names together in death as well as in life. In his will is an item providing that a suitable monument shall be erected at his grave. We are unable to see any relevancy or materiality in this evidence to the question in controversy, and see no error in its exclusion. Other evidence of the same kind was properly excluded.

Alonzo Harper, one of the defendants, and a legatee under the will, was called by the defendants, and after showing that the witness was well acquainted with the testator in his lifetime he was asked: "Now you may state to the court whether from what you saw of him and talked with him and known him before, what in your judgment was the condition of his mental faculties, as to his being sound or unsound during the times that he was back there, after he came out here, including 1906?" Objection was made on the ground that witness was not competent to testify, because he was an interested party testifying in his own behalf; and on the further ground that his testimony was incompetent, irrelevant and immaterial. The court overruled the objection and allowed him to testify. He answered: "I did n't see anything wrong with his mind." In this there was no error. (*Grimshaw v. Kent,* 67 Kan. 463.) Other questions were propounded to this witness, but no answers were given, so they need not be considered.

Joseph Harper, another defendant, was placed upon

the witness stand. The same question was propounded to him and the same objection was made as in the case of Alonzo Harper. The objection was correctly overruled, under the case of *Grimshaw v. Kent*, 67 Kan. 463.

Questions were asked of William Kemmerer and John W. Harper which were objected to, but no testimony was given and they need not be considered.

Objection was made to the testimony of Min. S. Harper, who was the widow of James M. Harper and after his death had the case revived in her name. She was called as a witness for the defendants. Objection was made on the ground that she was incompetent because of her relationship with James M. Harper. The statute upon this subject, being the third subdivision of section 321 of the code of 1909, reads:

"The following persons shall be incompetent to testify: . . . Third, husband and wife, for or against each other, concerning any communication made by one to the other during the marriage, whether called while that relation subsisted or afterward."

She did not testify to any communication made between herself and husband, and, the objection being placed expressly upon this ground, no error was committed in the admission of her testimony.

In view of the whole case we are unable to see where any prejudicial error has been committed, and the judgment of the district court is affirmed.